**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SCOTT KEECH,<br><br>        Plaintiff<br><br>    v.<br><br>SURGICAL CARE AFFILIATES, LLC; SCAI HOLDINGS, LLC; COMPANY A (A JOHN DOE DEFENDANT); and COMPANY B (A JOHN DOE DEFENDANT),<br><br>        Defendants. | Case No. 1:21-cv-00741<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Scott Keech ("Plaintiff") alleges as follows:

I.    <u>SUMMARY OF THE ACTION</u>

1.    Defendant Surgical Care Affiliates, LLC ("SCA") and its co-conspirators Company A and Company B are the largest operators of outpatient medical care centers in the United States. They compete with one another to hire and retain employees nationwide. As alleged herein, however, Defendants conspired to restrain competition and reduce compensation for their senior-level employees. Plaintiff is one such former senior-level employee of Defendant SCA. He brings this suit on behalf of himself and a Proposed Class of similarly-situated persons to obtain damages for the harm they suffered and to prevent Defendants from retaining the benefits of their unlawful conspiracy.

2.    The conspiracy alleged herein was first revealed publicly on January 7, 2021, with an announced grand jury indictment obtained by the United States Department of Justice ("DOJ"). *See United States of America v. Surgical Care Affiliates, LLC, et al.*, No. 3-21 CR 0011-L (N.D. Tex.) ("DOJ Action"). In the DOJ Action, the Government alleges that beginning at least as early as 2010, SCA orchestrated a conspiracy with Company A and Company B

through which SCA and Company A, and SCA and Company B, agreed with one another to refrain from soliciting each other's senior-level employees, and refrain from hiring them, without the consent of their current employer. These anti-competitive "no-poach" agreements spanned several years and were monitored and enforced by Defendants' executives, including the CEOs.

3.      Defendants' no-poach conspiracy was a tool to suppress employee compensation. It was a naked agreement to reduce labor competition which was not reasonably necessary to further any legitimate business transaction or lawful collaboration among the Defendants.

4.      The no-poach agreements accomplished their purpose. They reduced competition for Defendants' employees and suppressed Defendants' employee compensation below competitive levels. The company disrupted the efficient allocation of labor that would have resulted if Defendants had competed for, rather than colluded against, current and prospective employees.

5.      In addition to reducing compensation, Defendants' agreements also denied their employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment.

## II.      JURISDICTION AND VENUE

6.      Plaintiff brings this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

7.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

8.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events

2129781.1

giving rise to Plaintiff's claims occurred in this district and a substantial portion of the affected interstate trade and commerce was carried out in this district.

9.     Defendants are subject to the jurisdiction of this Court because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in an illegal Conspiracy throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) was engaged in an illegal Conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## III.    THE PARTIES

### A.    Plaintiffs

10.     Plaintiff Scott Keech was employed by SCA from approximately 2011 to March 2012 as a Regional Director of Operations and Clinical Services in the San Francisco, California area.  Plaintiff is a citizen and resident of the State of California.  As a Regional Director, Mr. Keech was the senior leader and nurse executive responsible for clinic operations, nursing practice, and the provision of care at ambulatory surgery centers throughout California.

### B.    Defendants

11.     Defendant SURGICAL CARE AFFILIATES, LLC was a company organized and existing under the laws of Delaware with its principal places of business in Deerfield, Illinois. Defendant SCAI HOLDINGS, LLC was a company organized and existing under the laws of Delaware, and was the successor entity to Surgical Care Affiliates, Inc.  Collectively, the defendants did business as Surgical Care Affiliates ("SCA").  SCA owned and operated outpatient medical care facilities across the United States, employing over 10,000 people in a network of over 200 ambulatory surgery centers in 35 states that perform 1 million procedures a year.  SCA employed individuals to operate its business at its headquarters locations and at other

locations across the United States. According to Becker's ASC, an industry publication, SCA is the third-largest chain of ambulatory surgery centers in the country, with quarterly revenues exceeding $279 million.

12.     Company A was a company organized and existing under the laws of Delaware with its principal place of business in Dallas County within the Northern District of Texas. Company A owned and operated outpatient medical care facilities across the United States and employed individuals to operate its business at its headquarters location and at other locations across the United States. Company A is one of SCA's largest competitors. The identity of Company A is unknown to Plaintiff at this time, but Plaintiff will seek leave to amend this complaint once Company A's identity has been ascertained.

13.     Company B was a company organized and existing under the laws of Delaware with its principal place of business in Denver, Colorado. Company B owned and operated outpatient medical care facilities across the United States and employed individuals to operate its business at its headquarters location and at other locations across the United States. Company B is one of SCA's largest competitors. The identity of Company B is unknown to Plaintiff at this time, but Plaintiff will seek leave to amend this complaint once Company B's identity has been ascertained.

**C.**     **Co-conspirators**

14.     Upon information and belief, various companies and individuals not made defendants in this complaint participated as co-conspirators in the alleged conspiracies, and performed acts and made statement to further the conspiracy.

IV.     **FACTUAL ALLEGATIONS**

    A.     **Defendants' No-Poach Conspiracy**

        1.     **Agreement Between SCA and Company A**

15.     SCA and Company A are competitors in the recruitment and retention of senior-level employees across the United States.

16.     Beginning at least as early as May 2010 and continuing until at least as late as October 2017, the exact dates being unknown, SCA and Company A entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.

17.     The agreement between SCA and Company A was formed by the CEOs of both companies, identified as "Individual 1" and "Individual 2," respectively, in the DOJ Action.

18.     Upon information and belief, "Individual 1" refers to Andrew P. Hayek, who was the CEO of SCA from 2008 to mid-2017.  In mid-2017, Mr. Hayek was named CEO of OptumHealth, after Optum (a subsidiary of UnitedHealth Group) acquired SCA.  With respect to the allegations below, Mr. Hayek was at all times acting on behalf of SCA while engaged in the company's management, direction, control, or transaction of its business or affairs

19.     The true identity of "Individual 2" is presently unknown to Plaintiff.  According to the DOJ, Individual 2 was the CEO of Company A and was at all times acting on behalf of Company A while engaged in the company's management, direction, control, or transaction of its business or affairs.

20.     As alleged in the DOJ action,[1] on or around May 14, 2020, Individual 2 e-mailed other employees of Company A, stating "I had a conversation w [Mr. Hayek] re people and we reached agreement that we would not approach each other's [employees] proactively."  This was

---

[1]  The identities of Mr. Hayek, Company A, and Individual 2 are not revealed in the DOJ Action.

just one example of meetings, conversations, and communications between SCA and Company A regarding the solicitation of senior-level employees, during which SCA and Company A agreed not to solicit each other's senior-level employees.

21.     SCA and Company A both instructed certain executives, employees, and recruiters not to solicit senior-level employees from each other's companies.  For example, the DOJ alleges that on or about November 11, 2013, a senior human resources employee at Company A instructed a recruiter "Please do not schedule a call w/[candidate], thanks.  She would have to apply for the job first.  We cannot reach out to SCA folks.  Take any SCA folks off the list."  Similarly, on or about July 17, 2017, a human resources employee at Company A who believed a candidate was employed by SCA e-mailed a recruiting coordinator stating that the candidate "look[ed] great," but that she "can't poach her."

22.     SCA and Company A monitored one another's compliance with the no-poach agreement by requiring senior-level employees of SCA and Company A who applied to the other company to notify their current employer that they were seeking other employment in order to be considered.  For example, on or about October 16, 2015, the DOJ alleges that Mr. Hayek e-mailed a human resources executive at SCA: "Putting two companies in italics ([Company A] and [Company B]) – we can recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking."  Thus, the agreement not to solicit one another's employees also included a component that barred each company from even interviewing a potential candidate who applied of their own volition, unless the current employer was notified and approved of the application.

23.     SCA and Company A did not advise senior-level employees of the no-poach agreement.  Rather, when such an employee at one company applied for a position at the other, they were sometimes told by human resources personnel that they would proceed only if the employee let their current employer know of their interest in the position.  For example, on or about November 1, 2013, Company A employees discussed whether to interview a candidate who was currently working at SCA in light of the "verbal agreement with SCA to not poach their folks . . . ."  Individual 2 told the senior human resources employee that, "[w]e do have that agreement and want to stick by it.  If [candidate] indeed did approach us, and is willing to tell [Mr. Hayek] that I'm ok."  The senior human resources employee at Company A commented, "Yikes, she is not going to want to do that.  But I will check."

24.     SCA and Company A alerted one another about instances of recruitment of employees by the other, and took steps to remedy such violations of their no-poach agreement. For example, on or about December 8, 2015, Individual 2 informed Mr. Hayek: "Just wanted to let you know that [a recruiting company] is reaching out to a couple of our execs.  I'm sure they are not aware of our understanding."  Mr. Hayek instructed other executives of SCA: "We should continue to flag [Company A] on our 'do not call' list to recruiters – is OK if we get an inbound inquiry and the leader has communicated within [Company A] that they want to leave, but outbound calls should not be occurring."

**2.      Agreement Between SCA and Company B**

25.     Beginning at least as early as February 2012 and continuing until at least as late as July 2017, SCA and Company B entered into and engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.

- 7 -

26.     The agreement was formed by the CEOs of SCA and Company B, identified in the Grand Jury Indictment as "Individual 1" and "Individual 3," respectively.  As alleged above, upon information and belief, "Individual 1" refers to Mr. Hayek.  The identities of Company B and "Individual 3" are currently unknown to Plaintiff.  Individual 3 was at all times acting on behalf of Company B while engaged in the company's management, direction, control, or transaction of its business or affairs.

27.     SCA and Company B participated in meetings, conversations, and communications with one another to discuss the solicitation of senior-level employees, and agreed during the course of such interactions not to solicit each other's senior-level employees or to consider applicants from the other company without confirming that the applicant had notified their current employer.  For example, on or about October 20, 2014, Individual 3 e-mailed Mr. Hayek that, "Someone called me to suggest they reach out to your senior biz dev guy for our corresponding spot.  I explained I do not do proactive recruiting into your ranks."

28.     On or around December 12, 2015, a senior human resources executive at SCA e-mailed a recruiter confirming that "[Company A] and [Company B] are off limits to SCA."

29.     SCA and Company B monitored compliance with the no-poach agreement by requiring each other's senior-level employees to notify their current employer that they were seeking employment for their applications to be considered.  For example, on or about October 16, 2015, Mr. Hayek e-mailed SCA's human resources executive, as alleged above, confirming that, as with Company A, for Company B, SCA could "recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking."  Similarly, on or about April 7, 2017, Mr. Hayek was contacted by a consultant regarding his interest in a candidate employed by Company

B, and Mr. Hayek responded: "In order to pursue [candidate], he would need to have already communicated that he is planning to leave [Company B] – that's the relationship that we have with [Company B]." The consultant responded that he was "glad you arrived at that agreement with [Individual 3]." Such a notice requirement further restricts movement of employees because employees are often reluctant to notify a current employer they are looking for other opportunities before securing an offer.

30. SCA and Company B did not tell unsolicited candidates from either company about the existence of the no-poach agreement. Instead, they told applicants that their applications could only proceed if they notified their current employers. For example, on or about April 26, 2016, SCA's human resources executive emailed a candidate from Company B who was based in Dallas, Texas, that applicants from Company B could be considered only if they "have been given explicit permission by their employers that they can be considered for employment with us."

31. SCA and Company B also alerted one another about instances of recruitment of employees and took steps to remedy those violations of their no-poach agreement. For example, on or about June 13, 2016, an employee of SCA relayed a recruitment noting that "I thought there was a gentleman's agreement between us and [Company B] re: poaching talent." An SCA executive replied, "There is. Do you mind if I share with [Mr. Hayek], who has most recently addressed this with [Individual 3]." Mr. Hayek then relayed the instance of recruitment to Individual 3 who replied that he "[w]ill check it out."

**B.** **Labor Markets Are Imperfectly Competitive, Particularly for Jobs in Which Outpatient Care Center Experience or Skills Are Valuable**

32. Labor markets are far from perfectly competitive. They do not function like commodity markets where market-wide demand and supply determines a single market price.

Defendants do not simply pay a "market wage" for a particular employee as one might buy a pound of silver on a metals exchange. Instead, market participants determine compensation levels by interacting with each other. This is particularly true for jobs in which specialized experience or skills are valuable, such as those with experience operating outpatient medical care centers. Market frictions result when, as here: (1) workers are not fully informed about all alternatives available to them; (2) it is costly for workers to move between employers; and (3) workers have limited options for essentially identical positions.

33.    These market frictions are well-recognized in labor economics. For instance, the 2010 Nobel Prize in Economics was awarded to Peter A. Diamond, Dale T. Mortensen, and Christopher A. Pissarides, "for their analysis of markets with search frictions." Almost all of their research (known as the "search and matching" framework) was about the analysis of frictions in labor markets caused by limited information.

34.     "Price discovery" refers to the process by which a market searches for prices when information about supply and demand is imperfect. Class members worked in an environment characterized by such imperfect information, and thus the price discovery framework is applicable. The speed at which price discovery operates depends in part on the manner and speed in which information is disseminated among employers and employees.

35.    Employees with experience or skills in the outpatient medical care industry were harmed by Defendants' no-poach agreements in part because Defendants are the market leaders in their fields. SCA, Company A, and Company B are the nation's largest operators of outpatient medical care centers as well as one another's top rivals for labor.

36.    Defendants also are among the largest employers in the outpatient medical care center field, with a nationwide reach. For example, SCA employed over 10,000 employees

nationwide.  Upon information and belief, Company A and Company B employed at least the same number of people.

37.     There is high demand for and limited supply of upper-middle level employees with experience or skills relevant to outpatient medical care.  As a result, critical jobs in this industry can remain vacant while firms try to recruit and hire individuals with the requisite skills, training, and experience for a job opening.  Employees within this industry, like those working for the Defendants, are key sources of potential talent to fill these openings.

38.     The importance of relevant industry experience to Defendants is reflected in their job postings.  For example, in a job posting for a Senior Director of Development in Houston, Texas, SCA emphasizes that "[h]ealthcare industry knowledge is preferred."  In a posting for Vice President of Practice Operations in Southern California, SCA notes that qualifications include experience "within a highly professional and successful healthcare services company." For a Director of Operations in Portland, SCA states that "management experience in ASC [Ambulatory Surgery Center] operations or hospital outpatient centers is strongly preferred."

39.     Defendants employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire employees.  Defendants also receive direct applications from individuals interested in employment opportunities.

40.     Directly soliciting employees from other outpatient care center employers is a particularly efficient and effective method of competing for qualified employees.  Soliciting involves communicating directly—whether by phone, email, social and electronic networking, or in person—with another firm's employee who has not otherwise applied for a job opening.  Such direct solicitation can be performed by individuals of the company seeking to fill the position or by outside recruiters retained to identify potential employees on the company's behalf.  Firms in

the outpatient medical care industry rely on direct solicitation of employees of other similar employers because those individuals have specialized experience and may be unresponsive to other methods of recruiting.

41.     In a properly functioning and lawfully competitive labor market, outpatient medical care center employers compete with one another to attract talent for their employment needs.  It is this competition among employers for workers that determines the level of compensation.  While employers would like to pay low wages for high quality or experienced workers, competition increases the available job opportunities and forces employers to offer higher compensation.  Competition also improves employees' ability to continue to negotiate for better salaries and other terms of employment.  Soliciting and hiring employees from other outpatient medical care employers is attractive to companies like Defendants because these employees have training and experience that are lacking in entry-level hires or hires from a different industry.  This is particularly true for the senior-level employees that were victimized by the alleged no-poach agreements.  Hiring employees directly out of a training program or from a different industry requires the company to invest significant resources in identifying, assessing, and training new employees, and is generally unsuitable for senior-level positions. For these reasons and others, lateral hiring within the outpatient medical care industry is a key form of competition.

42.     Competition for workers via lateral hiring has a significant impact on compensation in a variety of ways.  First, competition facilitates an important flow of information about opportunities and compensation.   For example, an employee who is solicited by a rival company or who is interviewed or receives a job offer is given insight into how other companies value her work and experience and what compensation and benefits these other

- 12 -

companies typically pay or are willing to pay to lure her from her current employer. This information is not otherwise readily available to employees who rely mostly on these encounters and word-of-mouth from peers and colleagues, as opposed to employers (including Defendants), who often hire private consulting firms to provide information about available compensation rates in the market. No-poach agreements restrain employees' access to this information by eliminating or reducing the job events that foster the flow of information. While it was typical for outpatient medical care recruiters who worked for Defendants to share pay and benefit information with those employees they solicited, the no-poach restrictions meant that this information was not being provided to employees at Defendants' companies. Employees would have used that information to negotiate higher pay at their current job, or to switch employers for a superior offer. Indeed, empirical economic research confirms that employees who change jobs voluntarily typically have faster wage growth than those who remain in the same job. Employees would have also shared this information with their co-workers, multiplying the impact of each offer as the information would have spread through worker social networks.

43.     Second, the threat of losing employees to competitors encourages employers to preemptively increase and maintain appropriately high compensation to ensure high morale, productivity, and retention. Absent appropriate compensation, employees will seek positions that offer more generous compensation and benefits elsewhere, be receptive to recruiting by a rival employer, and/or reduce their productivity and morale. Once an employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for one individual, if retention is possible at all, and cascading pressures on compensation of other employees where internal equity and fair pay analysis would demand similar raises. Employers therefore have an incentive to preempt lateral departures by paying employees well enough that

- 13 -

they are unlikely to seek or pursue outside opportunities. Preemptive retention measures thus lead to increased compensation for employees.

44. Third, because many outpatient medical care center employees are integrated into teams, some workers who move to positions at different companies may bring others with them. Just as competition forces employers to preemptively or reactively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for these related workers. Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to move with them or to seek parallel lateral positions.

45. Defendants' conspiracy restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market. This disruption and resultant suppression of compensation was not limited to particular individuals who would otherwise have been solicited or sought alternative employment. Instead, the effects of eliminating solicitation and lateral hiring, pursuant to agreement, caused widespread impact on employees of the participating companies by eliminating or reducing the flow of information and the need for preemptive and reactive increases to the compensation structures that determined Class pay.

C. **Defendants Maintained Compensation Structures That Tethered Employees' Pay To One Another**

46. Defendants, like other sophisticated corporations, maintained internal compensation systems that preserved relatively stable relationships between the pay of their employees. The effect of such systems is that an adjustment to the pay of some employees typically results in adjustments to the pay structure as a whole, affecting the pay of all employees. The implication is that a distortion to the labor market's competitive process, such

- 14 -

as the distortions caused by Defendants' no-poach agreements, would have suppressed the pay of all employees, not just those who proactively sought to work for a competitor.

47.     To understand how and why, it is important to understand compensation theory. The role of compensation is to attract and recruit candidates to work for a company, prevent employees from leaving for jobs elsewhere (because turnover is costly), and motivate them to perform their jobs well. Employees may leave their jobs if they find other ones that pay better.

48.     In addition, compensation policies are informed by fairness concerns, which affect a range of employee behavior, from motivation to perform jobs to decisions to search for new jobs. In short, employees' perceptions of unfair compensation are disruptive to productivity, morale, and retention.

49.     In the employment context, employees decide what constitutes "fair" pay based on comparisons between themselves and other employees at their company and in their field. For example, it is generally not considered fair for there to be pay differentials between workers doing the same work at the same level based solely on the fact that a few of these employees may have received an outside solicitation or offer of alternate employment. Employees do not care only about how they are paid compared to employees doing the same work, but also how much they make in comparison to those they work with, even if the jobs are not similar.

50.     Because perceptions of unfairness in compensation are detrimental to employers, Defendants had an incentive to ensure that their employees, including those at a senior level, felt that their compensation was fair based on broad comparisons across job descriptions and titles, both within and outside their companies. The concept of fairness in this context is often understood through the lens of "internal equity" and "external equity." "Internal equity" is a compensation principle that depends upon the extent to which pay levels are perceived to be fair

- 15 -

and objective compared to other employees *within* the same company. "External equity" is a similar principle that depends upon the fairness of pay levels when compared to similar employees *outside* the company.

51.     Defendants fostered both internal and external equity by maintaining formal compensation systems. These compensation structures restrict discretionary pay decisions and ensure objectivity and perceived fairness. They are also a mechanism by which the harm caused by Defendants' no-poach agreements would have affected the proposed Class as a whole, not just individual employees who would have otherwise received job offers from a competitor.

52.     The design of a formal compensation system generally has three steps: (1) the formulation of standardized job descriptions to identify the requirements and demands of all jobs; (2) a job evaluation to value those requirements and demands consistently across jobs to calculate holistically a wage or wage range for each job; and (3) sorting jobs into clusters or hierarchies ("job families") reflecting the organizational hierarchy and advancement pathways.

53.     Once the job classification process is complete, the next step is to determine the pay levels for each job title or family. Pay levels are generally first set by benchmarking wage levels for equivalent jobs in the labor market. Jobs that are similar at other employers are referred to as "benchmark" jobs. Wages for those jobs with an external "benchmark" form the foundation of the whole pay system, because pay levels for other jobs without such a benchmark will also be keyed to them. The outpatient medical care industry has a great many benchmark jobs because there are many occupations that are similar across employers.

54.     After identifying the "benchmark" jobs, the next step involves addressing concerns about fairness in pay levels in jobs that are similar but differ in experience levels. For

example, a Director of Nursing with ten years of relevant experience will generally be paid more than one with just a single year of relevant experience.

55. Then, a compensation system will address concerns about the structure of pay across different job titles. This applies to employees in different jobs who nevertheless have similar relative skills or value to Defendants, or who work together in teams or on projects. These employees care about their compensation relative to their professional peers, even if they are not performing similar work. For example, if there is too small a gap between the pay of a Director of Nursing and an outpatient medical care center CEO,[2] the CEO might feel that his or her work is being undercompensated in light of his or her professional skills, education, and contribution to the company. This is referred to as "compression," and it will place upward pressure on the pay of the CEO. Conversely, a very large discrepancy between the CEO's pay and the Director of Nursing's pay may result in the Director believing that his or her contributions to the company are not being rewarded proportionately, creating upward pressure on the pay of the Director. Pay structures address those concerns by implementing pay bands for disparate jobs that move together in a way that ensures that the differentials among these co-workers and team members remain largely consistent even as pay itself changes, so that a sense of fairness is maintained. Thus, movement in one part of the structure impacts the structure at large.

56. In sum, pay systems adjust pay levels across job titles and pools of employees to maintain internal and external equity to better foster morale and motivation across a company's

---

[2] The use of the term "CEO" does not refer to the Chief Executive Officer of any of Defendants. Rather, it is a title used by SCA, for example, to refer to the top administrator at each local outpatient medical care center.

- 17 -

labor force.  The existence of these systems means that the pay of one employee always bears a relationship to the pay of other employees.

57.     For example, if changes in the supply and demand within specific labor markets raise the pay of benchmark jobs and Defendants respond by raising the pay of those jobs to prevent employees in them from leaving, formal compensation systems also activate pay increases to other jobs to maintain internal equity.  That is because benchmark jobs with external referents are often grouped together with other jobs that do not necessarily have parallel analogs in the market.  The converse is also true: if changes in supply and demand within specific labor markets *reduce* the pay of benchmark jobs—for example, as a result of a no-poach agreement— then formal compensation systems will also result in pay decreases to other jobs to maintain internal equity.  Thus, formalized pay systems are a mechanism by which a raise or diminution in the pay of one group of employees is transmitted to other employees.

58.     The existence of such structures also means that raising the pay of one employee in order to retain them leads to pay raises for not only those who perform similar work (and thus are within the same pay bands or grades), but also for a wider swath of employees who base their notions of fair compensation on certain degrees of differentials between themselves and those other employees.

59.     Defendants' no-poach agreements were in place for several years, from at least 2010 to 2017.  Year after year, pay cycle after pay cycle, Defendants' pay structures were artificially suppressed because Defendants knew they could reduce pay increases without increasing retention risks.  Further, employee pay does not fluctuate like the prices of consumer products, where there may be a sale on one day and not on another, with prices going up and down in response to short-term market conditions.  Employee pay is much more stable, and

generally works like a one-way ratchet. A raise in one year creates the baseline for the next. Thus even small losses of pay in one year resulting from Defendants' no-poach agreements suppressed employee pay throughout entire subsequent careers. Defendants understood this well, and that is why their senior executives entered into their clandestine no-poach agreements.

        D.      **Effects on Interstate Commerce**

60.     During the relevant time period, Defendants employed members of the Proposed Class throughout the United States, including in this judicial district.

61.     The Conspiracy substantially reduced competition for labor in the outpatient medical care industry, and suppressed the efficient movement and compensation of senior-level employees, harming Plaintiff and members of the Proposed Class. The harm extended not only to those who did or would otherwise have sought to change companies, but also to those who had no intention of seeking other employment because the no-poach agreements enabled Defendants to maintain suppressed compensation levels generally.

62.     Thus, Defendants' no-poach agreements and related conduct substantially affected interstate commerce for employee services and caused antitrust injury throughout the United States.

        E.      **Defendants Concealed Their Conspiracy**

63.     Plaintiff and members of the Proposed Class did not and could not have discovered through the exercise of reasonable diligence that Defendants were engaged in secret no-poach agreements until January 7, 2021, when the DOJ publicly announced the Grand Jury Indictment against SCA. Plaintiff was not aware of the no-poach agreements before that time.

64.     Defendants conducted their no-poach agreements in a manner deliberately designed to avoid detection. For example, the agreement between the CEOs of SCA, Company A, and Company B was oral, deliberately not memorialized in a written agreement or contract.

Knowledge of the agreements was closely held by executives and recruiters of the Defendant companies who relied on direct and non-public communications with one another to manage and enforce the no-poach agreements, including in-person discussions, telephone conversations, and private email communications. None of the relevant communications within and among Defendants alleged herein were public before the Grand Jury Indictment's publication.

65. Additionally, rather than disclose their agreed-upon refusal to hire employees of a rival company without that company's permission, Defendants devised internal procedures by which implicated applicants could be flagged. Those applicants would then be asked to confirm that they had advised their current employer of their intention to leave as a condition for proceeding with the application process. However, applicants were not told that this requirement was pursuant to a no-poach agreement or coordination between the Defendants.

66. Further, Defendants concealed the existence of their no-poach agreements by affirmatively misrepresenting to their employees and prospective employees that they complied with the antitrust laws, never disclosing the no-poach agreements.

67. Defendants' secretive maintenance and enforcement of the no-poach agreements and misleading and false statements to current and prospective employees deliberately and effectively concealed their misconduct until DOJ's Grand Jury Indictment revealed it.

## V.    CLASS ACTION ALLEGATIONS

68. Plaintiff brings this action on behalf of himself and all others similarly situated (the "Proposed Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as follows:

> All natural persons who worked in senior-level positions in the United States for one or more of the following: (a) from May 1, 2010 to October 31, 2017 for Surgical Care Affiliates, LLC or one of its subsidiary outpatient medical care centers; (b) from May 1, 2010 to October 31, 2017, for Company A or one of its subsidiary

> outpatient medical care centers; or (c) from February 1, 2012
> through July 31, 2017, for Company B or one of its subsidiary
> outpatient medical care centers. Excluded from the Class are
> senior corporate officers and personnel in the human resources,
> recruiting, and legal departments of the Defendants.[3]

69. Based on the Grand Jury Indictment, the term "senior-level employees" as used throughout this complaint and in the proposed Class Definitions included, at a minimum, those with the title of Director or higher, as well as the top administrators at each outpatient medical care center, such as Chief Nursing Officers. The term does not include the senior corporate officers of each Defendant.

70. There are thousands of Class members. Joinder of all members of the Class, therefore, is not practicable.

71. The Class is precisely ascertainable from Defendants' records. Based upon these records and expert analysis, Plaintiff will determine what job families and titles constituted senior-level employees, and which were subject to or harmed by the no-poach agreements. These job families will define the job titles that will determine Class membership.

72. Plaintiff's claims are typical of the claims of the Proposed Class as they arise out of the same course of conduct by Defendants and the same legal theories.

73. Plaintiff will fairly and adequately represent the interests of the Proposed Class and have no conflict with the interests of the Proposed Class.

74. Plaintiff has retained counsel experienced in antitrust, employment, and class action litigation to represent them and the Proposed Class.

75. The case raises common questions of law and fact that are capable of class-wide resolution, including, but are not limited to:

---

[3] Plaintiff reserves the right to expand or narrow the alleged class period based on information obtained in discovery concerning the temporal scope of the no-poach agreements in question.

a.    whether Defendants agreed not to solicit or hire each other's employees;

b.    whether such agreements were *per se* violations of the Sherman Act;

c.    whether Defendants have fraudulently concealed their misconduct;

d.    whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for Plaintiff and the Proposed Class;

e.    whether Plaintiff and the Proposed Class suffered antitrust injury as a result of Defendants' agreements;

f.    the type and measure of damages suffered by Plaintiff and the Proposed Class; and

g.    the nature and scope of injunctive relief necessary to restore a competitive market.

76.    These common questions of law and fact predominate over any questions affecting only individual members of the Proposed Class.

77.    Defendants have acted on grounds generally applicable to the Proposed Class, thereby making final injunctive relief appropriate with respect to the Proposed Class as a whole.

78.    This class action is superior to any other form for resolving this litigation. Separate actions by individual Class members would be enormously inefficient and would create the risk of inconsistent or varying judgments.  There will be no material difficulty in the management of this action as a class action.

### FIRST CLAIM FOR RELIEF
**Conspiracy in Restraint of Trade to Allocate Employees**
**(Violation of 15 U.S.C. § 1)**

79.    Plaintiff re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

80.     Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Specifically, Defendants agreed to restrict competition for Class members' services through refraining from soliciting or hiring each other's senior-level employees, thereby fixing and suppressing the compensation of Class members.

81.     Defendants' agreements have included concerted action and undertakings among the Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for senior-level employees with skills and expertise valuable in the outpatient medical care industry.

82.     Defendants' combinations and conspiracy injured Plaintiff and the members of the Proposed Class by suppressing their compensation and depriving them of free and fair competition in the market for their services.

83.     Defendants' conduct and agreements are *per se* violations of Section 1 of the Sherman Act.

84.     The alleged conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants, the substantial terms of which were that Defendants would allocate senior-level employees by not soliciting each other's senior-level employees across the United States.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually, and on behalf of a Class of all others similarly situated, request that the Court enter judgment against Defendants, including:

- 23 -

A.     This action is certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative, and his counsel as designated Class Counsel;

B.     Defendants have engaged in a conspiracy in violation of Section 1 of the Sherman Act, and Plaintiff and the members of the Proposed Class have been damaged and injured in their business and property as a result of this violation;

C.     Plaintiff and the members of the Proposed Class recover threefold the damages determined to have been sustained by them as a result of the conduct of Defendants;

E.     Plaintiff and the members of the Proposed Class recover the costs of suit, including reasonable attorneys' fees and expenses, as well as, prejudgment and post-judgment interest as provided for by law or allowed in equity;

G.     Injunctive relief, declaring the no-hire agreement among Defendants unlawful and enjoining Defendants from enforcing the agreement or entering into similar agreements going forward; and

H.     All other relief to which Plaintiff and the Class may be entitled at law or in equity.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all claims and issues so triable.

Dated:  February 10, 2021            Respectfully submitted,

                                               */s/ Laurel G. Bellows*
                                               Laurel G. Bellows
                                               THE BELLOWS LAW GROUP, P.C.
                                               209 S. LaSalle St., Suite 800
                                               Chicago, IL 60604
                                               Telephone: (312) 332-3340
                                               lbellows@bellowslaw.com

- 24 -

2129781.1

Dean M. Harvey (*pro hac vice* forthcoming)
Nimish R. Desai (*pro hac vice* forthcoming)
Lin Y. Chan (*pro hac vice* forthcoming)
Yaman Salahi (*pro hac vice* forthcoming)
Michelle A. Lamy (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
dharvey@lchb.com
ndesai@lchb.com
lchan@lchb.com
ysalahi@lchb.com
mlamy@lchb.com

Jessica A. Moldovan (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN &BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
jmoldovan@lchb.com

Anthony Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone: (617) 485-0018
Facsimile: (508) 318-8100
anthony@paronichlaw.com

Samuel J. Strauss
TURKE & STRAUSS LLP
613 Williamson St. #201
Madison, WI 53703
Telephone: (608) 237-1775
sam@turkestrauss.com

*Counsel for Plaintiff and the Proposed Class*